

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION



| | | |
|---|---|---|
| United States of America, | : | Case No. 4:04CR430 |
| | : | |
| Plaintiff | : | Judge Donald C. Nugent |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Jorge A. Martinez, | : | **REPORT AND RECOMMENDED** |
| | : | **DECISION** |
| Defendant | : | |

 

This case is before this Court pursuant to Your Honor's Order of Reference "for a Report and Recommendation on the issue of restitution pursuant to 18 U.S.C. §§3663 and 3664."

Following notice by publication pursuant to 18 U.S.C. §3771(a)(2) to potential victims of the defendant of their right to seek restitution a "Request for mandatory restitution" pursuant to 18 U.S.C. §§3663, 3663A, 3664 and 3771(a)(6) and (e) was filed on behalf of: Estate of John Lancaster, Karen Lancaster, Executor; Estate of Blair Scott Knight, Richard W. Ashley, Administrator; Estate of William Swearman II, Cherly Zajackowski, Administrator; and Cynthia Faulk.

Evidentiary hearing was held July 11-13, 2006 at which testimony was taken from: Karen Lancaster Shells, the widow of John G. Lancaster (since remarried) and executor of his estate; Cheryl Swearman Zajackowski, the widow of William R. Swearman II (since remarried) and administrator of his estate; Cynthia Faulk; and Doris Knight and Phyllis Knight, respectively the sister-in-law and mother of Blair Scott Knight. Testimony was also received from Dr. Rod W. Durgin, a vocational expert.

Mr. Lancaster and Mr. Knight had been determined to have been victims of the defendant in the

AO 72A
(Rev. 8/82)

context of the criminal trial, and as to their survivors the issue was only entitlement to a monetary recovery. With regard to Mrs. Faulk and Mr. Swearman the threshold issue was whether they could be considered victims under Crime Victims Rights Act, 18 U.S.C. §3771, and thus entitled to restitution under 18 U.S.C. §3663 and/or §3664, with the amount of any potential recovery attendant upon resolution of the primary issue.

At the conclusion of the hearing this Court found, in a bench ruling, that Mrs. Faulk and Mr. Swearman had been subjected to the same course of unlawful conduct at the hands of the defendant as the jury had found was perpetrated upon Mr. Lancaster and Mr. Knight, so that they too could be considered as a "victim," entitled to a restitution award. This Court further found that the amounts of the restitution awards should be $17,500 for Mrs. Faulk, $123,000 for Mr. Knight, $275,000 for Mr. Lancaster and $310,00 for Mr. Swearman. Rather than restate the rationale of these fact findings, this Court requested that the bench ruling be transcribed and it is appended hereto and incorporated by reference herein.

Government counsel submitted "Proposed Findings Of Fact And Conclusions Of Law Re: Restitution" in advance of the hearing, and only those portions pertaining to the four claimants were the subject of disagreement, beyond the broader issue of whether any order of restitution should be made. It is, therefore, recommended that Your Honor adopt that proposal, with the following modifications.

In lieu of paragraph eleven the following be substituted:

11. The evidence establishes a loss of future earnings of John Lancaster of $264,882.55, and the defendant shall make restitution to the estate

2

of Mr. Lancaster in that amount.[1]

In lieu of paragraphs thirteen and fourteen the following be substituted:

13.   Mrs. Phyllis Knight has testified that the family members incurred funeral expenses for the burial of Mr. Knight in the amount of $8,633.10 and purchased a cemetery plot for $800.00. The defendant shall make restitution to Mrs. Knight for these expenses in the amount of $9,433.10.

14.   The evidence establishes a loss of future income (SSI) for Blair Scott Knight in the amount of $113,566.90, and the defendant shall make restitution to the estate of Mr. Knight in that amount.

In lieu of paragraph eighteen the following be substituted:

18.   The evidence establishes a loss of future earnings of Mr. Swearman in the amount of $303,795.83, and restitution shall be made to the estate of Mr. Swearman in that amount

In lieu of paragraph twenty the following be substituted:

20.   Evidence has been received as to medical expenses incurred by Mrs. Faulk and loss of earnings by her resulting from the defendant's conduct in the approximate aggregate amount of $17,500.00, and the defendant shall make restitution to her in that amount.

DAVID S. PERELMAN
United States Magistrate Judge

DATE:   July 19, 2006

## OBJECTIONS

---

[1]The reason for this odd number is that this Court, having rejected the projection of lost earnings made by Dr. Durkin, found that a total restitution award of $275,000 would be appropriate as a consequence of the death of Mr. Lancaster. Because his widow is entitled to payment of $10,117.45 that sum has ben deducted from the award to be made to his estate, which is the proper party to receive the restitution for his lost earnings.  Similar divisions have been made as regards Mr. Knight and Mr. Swearman.

3

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

AO 72A
(Rev. 8/82)

1

2    U S A v Jorge Martinez, Excerpt Restitution Hearing

3                  Wednesday, July 12th, 2006

4                  THE COURT:  You are excused.

5                  THE WITNESS:  Thank you, your Honor.

6                  THE COURT:  Anything further, gentlemen?

7                  MR. LEONE:  Your Honor, I would just proffer

8    the exhibits --

9                  THE COURT:  They have already been admitted.

10                 MR. ZUKERMAN:  And I would respectfully

11   submit that over my objection, sir.

12                 THE COURT:  Well, you didn't object

13   yesterday.

14                 MR. ZUKERMAN:  No, I didn't, but I didn't

15   hear this type of testimony yesterday, so I would object

16   to the admission of any of his expert reports.

17                 THE COURT:  Gentlemen, I think you know --

18   Mr. Penhallurick?

19                 MR. PENHALLURICK:  Yes.  Ms. Betzer asked

20   that I submit a couple of exhibits from the criminal

21   trial to the Court.

22                 THE COURT:  Those being --

23                 MR. PENHALLURICK:  One is Government's

24   Exhibit 300-A, which is a record of Blair Knight's

25   prescriptions.  It was prepared by the DEA.

1                  THE COURT:  I think I already have that.

2                  MR. ZUKERMAN:  That was John Lancaster's

3 yesterday.

4                  MR. PENHALLURICK:  This is apparently Blair

5 Knight's.

6                  THE COURT:  Okay.

7                  MR. PENHALLURICK:  And the reason I

8 understand that's being submitted is to show the pattern

9 of similar activity with relation to Mr. Swearman.

10                  THE COURT:  Okay.

11                  MR. PENHALLURICK:  And the other is an

12 excerpt from testimony of Dr. Parran, the addiction

13 specialist called during the trial to show similar

14 activity, and in looking at the excerpt of testimony,

15 pages 49 to 51, Dr. Parran testified with relation to the

16 veracity of the patient's subjective complaints of pain

17 and what is in the medical records, and he compared with

18 regards to Mr. Lancaster his complaints of pain to

19 Dr. Martinez with medical notes when he had seen a

20 surgeon at the same time period.

21                  THE COURT:  Well, I would verify that both

22 Ms. Faulk and Mr. Swearman do come within the ambit of

23 the Act; that there is enough similarity in the pattern

24 of activity submitted at the criminal trial that I am

25 prepared to find that each of them is a victim and

1   entitled to restitution under the Act.

2              Let me tell you preliminarily where I am

3   going, and then I will be happy to hear argument.  As I

4   think you may have concluded from my comments with regard

5   to Mr. Swearman earlier, you are right, I do not have

6   medical evidence, and for the purpose of this proceeding,

7   I don't think it would have been possible to do what

8   needed to be done in the context that we are dealing

9   with.

10             Therefore, I must make reasonable

11  inferences.  I will not make any inferences on

12  inferences, but I am prepared to make the inference based

13  on the testimony that it was after he came under the care

14  of Dr. Martinez that the paranoia developed; that it

15  worsened; that he lost his job by reason of his

16  dependence on Dr. Martinez, and from that, I am going to

17  come to the conclusion that the course of activity was a

18  precipitating factor leading to his suicide.

19             And, therefore, I am not going to find that

20  his suicide cuts off any entitlement to loss of future

21  income.

22             MR. ZUKERMAN:  So it is not an intervening

23  cause?

24             THE COURT:  I am not finding the suicide to

25  be an intervening cause.  That is where I am headed at

1    this point.  And because Mr. Swearman was working right

2    up to the point where he lost his job because of the

3    absenteeism, even though I have some very obvious

4    problems with Dr. Durgin in other regards, I think I am

5    going to credit Dr. Durgin's calculations with regard to

6    Mr. Swearman.

7              The 27 percent fringes he put in are based

8    on a national average, and I heard nothing to suggest

9    that over the period if he would be employed he would not

10   have had fringes at that level.  Mr. Zukerman, unless you

11   can -- well, no.  I do have to make a reduction because

12   the $462,716 figure was based on a constant personal

13   consumption of 15 percent, and we know that that personal

14   consumption rate was going to increase over the years as

15   the family unit shrank with 5 to 4 to 3 to 2.

16             It was going to come down from 15 percent

17   personal consumption -- I'm sorry -- it was going to

18   increase from 15 percent personal consumption to 30

19   percent personal consumption when all the children were

20   gone and the children were going to be gone -- in fact,

21   with Swearman, there were three children, but weren't two

22   of them already emancipated at that point, at the point?

23             So the 15 percent was wrong to begin with

24   because that was based on three children when, in fact,

25   there was only one child in the household.

1          MR. LEONE:  I attempted to ask that question

2     when I got back up.  That's why I attempted to ask the

3     question.

4          THE COURT:  But the point is, unless he did

5     a recalculation, the child that was still in the

6     household was going to be there for how many years more?

7          MR. ZUKERMAN:  Ten.

8          THE COURT:  Ten more years.

9          MR. ZUKERMAN:  Yes, your Honor.  There was a

10    child for four years, and there was the dependent

11    grandchild for ten years.

12         THE COURT:  That's Swearman.

13         MR. LEONE:  That was Mr. Swearman.

14         THE COURT:  So we have one kid for four

15    years, one kid for ten years.  So the 15 percent personal

16    consumption is going to jump up to 30 percent personal

17    consumption after ten years.  And his projection of lost

18    earnings covers roughly 20 years, 43 to 66, covers 23

19    years.

20         So, again, without having him sit here and

21    do a year-by-year recalculation, we see that the figure

22    goes 31 to 15 to 20 to 25 to 31 -- I am going back to --

23    I can do what juries can do, which is all right.  I am

24    not satisfied I have accurate figures, so I am going to

25    do the right thing.

1    So if we look at this and it is going to

2   jump up, the personal consumption is going to jump up to

3   31 percent about half way through, I would say knocking

4   that $462,716 down to around $300,000 is somewhere -- is

5   close enough to rational, rationality that a

6   recommendation of a $300,000 award for Mr. Swearman plus

7   we have funeral and burial expenses, which were -- I can

8   get those figures in a second -- roughly $6,200.  So my

9   penchant for rounding figures off, $310,000 for

10   Mr. Swearman.

11    Finding Faulk to come within the ambit --

12    MR. ZUKERMAN:  Her bills were $17,291.48,

13   but we were unclear as to the amount that insurance had

14   paid, your Honor.

15    THE COURT:  But we also don't know whether

16   the subrogation -- again, I am going to give it to her,

17   so $17,291.48?

18    MR. ZUKERMAN:  Yes.

19    MR. LEONE:  Your Honor, if I may, there was

20   that additional late exhibit of her loss of earnings, and

21   that was admitted as well, $136.20.

22    THE COURT:  All right.  I love round

23   figures, $17,500 as to Faulk.

24    I am satisfied that Mr. Knight was never

25   going to generate any income other than that $365 a year

1  in SSI that he was getting, and I am giving him about a
2  30-year life expectancy because of his substance abuse
3  problems, so that gives us $189,000 less his 31
4  percent -- $190 times 70 percent personal consumption
5  out -- that gives me $113,000 for Mr. Knight plus what
6  was his -- what did the family incur in burial expenses?

7           MR. ZUKERMAN:  $9,433 --

8           THE COURT:  Might as well put another
9  $10,000 in rounding it up to $123,000.

10          Mr. Lancaster is the toughest one for me.
11 It was pretty clear the projection on Lancaster with
12 personal consumption out is the $353,588 figure.  It is
13 pretty clear that first operation didn't take.  We don't
14 even know definitely what the first operation was.  We do
15 know that the second one was a fusion.

16          And I think Dr. Durgin is right, a lot of
17 people come back from fusions.  On the other hand, there
18 is a lot of failed fusions.  So I am going to tell you
19 that my inclination to do with Mr. Lancaster is what I
20 think a nonjudicial officer would do, which is to say,
21 you know, might be a crap shoot, so if he lost about
22 $353,000 projected loss of earnings, I am going to split
23 the baby and say maybe yes; maybe no, so we will give him
24 $175,000 plus what his other expenses were, which is
25 another --  another $10,000.  So we will plug in $185,000

1    for the Lancasters.

2              Now, that is talking off the top of my head.

3    It is where I think I am going, but I will give each of

4    you, if you wish, this afternoon the opportunity to

5    convince me that I am dead wrong.  And I will give you

6    the opportunity to say to me, Judge, if you are not

7    inclined to say to me I think I can convince you you are

8    dead wrong and that if you file a recommended decision

9    with Judge Nugent based on what you have just said from

10   the bench, we will not file objections to that

11   recommended decision, then I will simply prepare a report

12   and recommended decision saying that I am recommending

13   the following resolution on the motion for mandatory

14   restitution and hope you stand by your word.

15              And I will have -- I won't have to do much

16   more than that.  But let's start with -- do you want to

17   try and convince me I am dead wrong?

18              MR. ZUKERMAN:  Mr. Leone?

19              MR. LEONE:  Judge, can I have an opportunity

20   to speak with my clients in the back of the courtroom?

21              THE COURT:  You certainly may.  And if you

22   want to take -- we will take a brief recess, and you can

23   do some soul searching while we are recessing, but before

24   you speak with your clients, let me talk to each of you

25   privately.

1          (Discussion held off the record.)

2          THE COURT:  Mr. Leone, do you still want

3    some time to talk with your clients, or are you prepared

4    to make a presentation to the Court?

5          MS. BETZER:  We are prepared to make a

6    presentation to the Court, your Honor.

7          THE COURT:  All right.  Please do so.

8          MR. LEONE:  Your Honor, thank you for your

9    comments what you might do in this case after hearing

10   this evidence.

11         Obviously, Dr. Durgin testified to some

12   consumption figures, Judge, with regard to all three of

13   the deceased.  With respect to the -- Mr. Lancaster,

14   John Lancaster, as you know, Dr. Durgin's testimony was

15   taking out the consumption figures that he thought was

16   appropriate in this scenario, that the Lancaster

17   survivors would net $353,588.

18         And it is my understanding, your Honor, that

19   you are taking a lower consumption figure than Dr. Durgin

20   had recommended in this case.  I think that it would be

21   more appropriate, your Honor, to consider that

22   Dr. Durgin's consumption figures based on the facts of

23   this case, we believe it should not be reduced that

24   significantly to the effect of a net of $175,000.

25         We believe it is more appropriate, your

1    Honor, to increase that figure to $300,000, but we will

2    leave that to the Judge's learned discretion.  Your

3    Honor, that's basically what I have to say.

4                    THE COURT:  And with regard to Swearman,

5    Faulk, and Knight, you have no thoughts to share on those

6    subjects?

7                    MR. LEONE:  I have no thoughts to share,

8    your Honor.

9                    THE COURT:  Mr. Zukerman?

10                   MR. ZUKERMAN:  Thank you.  With regard to

11   Swearman and Faulk, we would object.  We do not believe

12   they fall under victim statute nor was there any fraud

13   alleged perpetrated on her in the indictment nor was any

14   evidence of that presented here.  We would object to that

15   award.

16                   With regard to Swearman, Mr. Swearman was

17   named in the indictment.  However, his insurance company

18   was named as the victim and respectfully contend he does

19   not fall within the purview of the fact.  Moreover, we

20   believe there was no competent medical evidence presented

21   and/or competent legally binding evidence presented that

22   would give an illumination as to the cause of his

23   paranoia and that which resulted in his unfortunate

24   death.  On that basis, we are objecting to the awards of

25   Mr. Swearman.

1        With regard to Blair Knight, we do not

2   believe SSI is covered under the loss of income under the

3   statute, and as such, we do not believe he is entitled to

4   any compensation.  Moreover, we respectfully disagree

5   with the Court's calculation he had a 30-year life

6   expectancy, and here is a gentleman who killed himself on

7   an overdose and believe that the $189,000 calculation

8   reduced to $113,000 calculation is excessive.  We would

9   agree his family should be compensated for the funeral

10  and burial expenses.

11        With regard to Ms. Lancaster, the Lancaster

12  estate, we will again tender a respectful objection.  I

13  believe the evidence indicated that there was really less

14  than more likely probability that he would reenter the

15  work force, and as such, we do not believe he should be

16  entitled to compensation under the Act.

17        THE COURT:  Mr. Zukerman, I appreciate your

18  comments, but I think I am going to for the most part

19  stand by my determination.  However, it is dangerous to

20  shoot from the hip, and giving the matter some further

21  thought, I think I may have been a little severe in the

22  reduction with regard to Lancaster, and I am going to up

23  my recommended figure to Judge Nugent with regard to

24  Lancaster to a total of $275.

25        And because we have time constraints, while

1   I would like to be more articulate in my report and

2   recommendation to Judge Nugent than I have been in my

3   remarks from the bench, I think in the interests of

4   expediency as opposed to articulateness -- is there such

5   a word -- that what I'm going to do is to ask the

6   reporter to simply transcribe the remarks that I have

7   made from the bench, inclusive of your responses and my

8   closing, and I will simply append that to a report and

9   recommendation, which will say for the reasons stated by

10  this Court, at the conclusion of the hearing, transcript

11  of which is appended hereto, it is recommended that

12  awards be made in response to the motion for mandatory

13  restitution as follows:  And the figures will be $310 for

14  Swearman; $17,500 for Faulk; $123 for Knight, and $275

15  for Lancaster.

16                  (Discussion held off the record.)

17                  THE DEFENDANT:  Your Honor, can I talk to

18  you?

19                  THE COURT:  No.

20                  THE DEFENDANT:  Just a word.

21                  THE COURT:  No.  Anything that is to be said

22  comes through Mr. Zukerman.

23                  THE DEFENDANT:  My objection about him

24  representing him.

25                  THE COURT:  All right.  Counsel, I thank you

1  very much for the courtesies over the last few days, and

2  it is a good thing we blocked off all three of them, and

3  unless there is anything further, we can adjourn.

4          (Hearing concluded at 4:05 p.m.)

5            - - - - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25